917 F.2d 431
 54 Fair Empl.Prac.Cas. 88, 54 Empl. Prac.
Dec. P 40,335,
63 Ed. Law Rep. 713
 Connie CUNICO, Plaintiff-Appellee,
v.
PUEBLO SCHOOL DISTRICT NO. 60, a public corporation,
Defendant-Appellant,
R. Michael Holmes; William J. Ballas; Jo Ann Lane; Alan
Takaki, members of the Board of Education of School District
No. 60; Phillip H. Schoo, Superintendent of Public School
No. 60; Daniel F. Martinez, the designated hearing officer
for the Public School No. 60 reduction in force; and Vern
Cochran and Dr. Vallejo, administrators of the Defendant
School District, Defendants.
 Nos. 88-2727, 88-2779.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 19, 1990.
 
 Joseph James Lenihan, Pueblo, Colo., for plaintiff-appellee.
 Kathleen K. Hearn (David W. Crockenberg and Thomas T. Farley on the brief) of Petersen & Fonda, Pueblo, Colo., for defendant-appellant.
 Before ANDERSON and BRORBY, Circuit Judges, and THEIS,* District Judge.
 THEIS, District Judge.
 I.
 This appeal follows a trial to the court brought under 42 U.S.C. Secs. 1981, 1983, and under Sec. 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e-5, in which plaintiff alleged that she had been discriminated against in her employment by defendant-appellant School District. The trial court found in plaintiff's favor on the issues of liability and awarded various forms of relief, from which defendant appeals. 693 F.Supp. 954. The court also denied plaintiff's costs for an expert witness and plaintiff appeals this order. 705 F.Supp. 1466. We affirm.[1]
 Connie Cunico is a white woman who began her employment with School District 60 ("the District") on February 27, 1977 as a social worker. She had obtained her masters degree in social work and was certified under state law. Colorado statutory law classifies its teachers and other professional personnel in the public schools according to a certification system. Under this system, school social workers, as well as numerous other non-teaching professionals, must be certified as "Type E" employees by the State Board of Education. Type E certificate holders are further classified by "endorsements," one of which is the endorsement of social worker. Regardless of the particular endorsement, Type E certificate holders are employed as "probationary employees" for their first three years, after which time they receive "tenure status." Accordingly, plaintiff's employment contract for the school year 1981-82 specified her status as "tenure." Although plaintiff testified that she understood tenure status to mean that she had achieved "job security" after her third year of employment, this classification was not the equivalent of statutory tenure under the Colorado Teacher Employment, Dismissal and Tenure Act, ch. 435, 1967 Colo.Sess.Laws 976 (codified as amended at Colo.Rev.Stat. Sec. 22-63-101 et seq. (1973 & Supp.)). With respect to its social workers, the practice of the District was to enter into annual contracts each school year that lasted 205 days, which was the term of plaintiff's contract for the 1981-82 school year.[2] Plaintiff's Eht. 45.
 The District began experiencing financial difficulties during the 1981-82 school year, forcing the Pueblo School Board to reduce its expenditures by various budgetary measures. Among the measures ultimately adopted by the Board was the cancellation of the contracts of certain employees. The Board sought to minimize the disruption of actual classroom teaching by making its expenditure cuts as far away from the classroom as possible. Because the activities of social workers did not directly relate to the classroom, this endorsement received low priority in developing a layoff policy, and the Board initially decided to cancel the contracts of all social workers in the District. This decision was modified, however, when the Board learned that state law required it to retain at least two social workers. To fulfill this requirement, the Board elected to retain Paula Pearson and Martin Quintana, the two social workers who had been employed the longest in the District. The contract of Connie Cunico, who held the third most senior position in the District, as well as the contracts of the other remaining five social workers were to be cancelled.
 The Board developed a written policy and appeal procedure governing its reduction in force ("RIF") decisions. Defendant's Ehts. G, I. The policy statement defined "teacher" to include "other persons certified by the State Board of Education." Defendant's Eht. I. Contracts for these teachers within each endorsement area were to be cancelled according to the seniority of their probationary status, "followed by the least tenured teachers thereafter." Id. at p 3. In addition, the District personnel office was to identify "the least seniored teacher in the district in each endorsement area in the district subject to reduction," id. at p 8, and "[i]f applicable, a choice of the declared vacancies [would] be granted to the most seniored teacher in each endorsement area in the district's reassignment pool." Id. at p 10. The RIF policy statement also provided that "[i]n the event of a reduction in force, the District shall make reasonable effort to maintain, as a minimum, the percentage of minority teachers employed within the District." Defendant's Eht. G. Those who desired to contest their cancellation could submit a written request for review by the Board's designated officer, Daniel Martinez. This review consisted of a hearing during which the sole issue for determination was "whether the decision to terminate was arbitrary or capricious with respect to the individual or [was] otherwise unjustified." Defendant's Eht. G, at 2. The hearing officer would make findings and recommendations for the Board, which would then vote on the proposed action.
 All six social workers whose contracts were to be cancelled requested a hearing. Among these was the request of Wayne Hunter, the only black social worker in the District. In support of his request, Mr. Hunter submitted his belief that the District had engaged in an obvious pattern of discrimination against blacks by excluding them from administrative level positions within the district. This complaint was investigated by Robert Overstake, the Executive Director of Staff Relations, and Helen Tomicich, the Director of Human Relations/Affirmative Action. These two officials recognized that the cancellation of Mr. Hunter's contract would create a temporary setback for the District's affirmative action goals, but nonetheless found no evidence of discrimination in the decisions to reduce the number of social worker positions and to accomplish these reductions on a seniority basis. Ms. Tomicich testified before the hearing officer that although the loss of the only black administrator was a "step backwards" for the District's affirmative action policy, the financial emergency necessitated Mr. Hunter's dismissal. R. Vol. III, at 251. Ms. Tomicich also testified that the District laid off its social workers according to "seniority."
 The hearing officer reviewed the proposed contract cancellations and stated his findings in a February 9, 1982 letter to the Board:
 The hearing officer finds the decision to terminate the social workers was not arbitrary or capricious or otherwise unjustified except in the case of Wayne Hunter. The hearing officer interprets the policy of the Board of Education regarding minority teachers to mean that they should protect with special consideration the only black administrator in the district.
 On February 12, 1982, the Board accepted the hearing officer's recommendations and rescinded the termination of Mr. Hunter's contract. The cancellation of all other social worker contracts became final.
 The Board rehired Rudy Armijo, an hispanic, as a fourth social worker on August 12, 1982. Like Mr. Hunter, Mr. Armijo also had less seniority than plaintiff at the time the contracts of the social workers were cancelled. At trial, defendants contended that Mr. Armijo was rehired because of his ability to speak Spanish, which would facilitate communication with the families of hispanic children. Plaintiff does not speak Spanish. The job description for this position, however, did not refer to proficiency in Spanish as a job requirement or preference. Plaintiff was not rehired until August 20, 1984.
 Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission on June 4, 1982 and exhausted her administrative appeals before instituting suit in federal court. The trial court found that the District's employment decision with respect to Mr. Hunter and plaintiff was obvious and overt racial discrimination that defendants must justify by a legitimate, non-discriminatory reason. The court found that the decision to retain Mr. Hunter was not supported by any specific provision of the District's affirmative action plan or by any racial imbalance in the relevant workforce. Further, the trial court noted that black persons constitute only 2% of the relevant workforce as well as of the Pueblo population, and concluded that the scarcity of blacks in the relevant workforce was solely responsible for any perceived racial imbalance. Accordingly, the court found the District's decision to retain Mr. Hunter, when plaintiff had superior seniority rights to a third position, was an unjustified, discriminatory action entitling plaintiff to back pay from the date of her termination and to recovery of attorney's fees. The trial court also found that the District had discriminated against plaintiff a second time when it hired Mr. Armijo. The parties stipulated to the amount of back pay and medical benefits plus interest, totaling $110,361.10, and the trial court awarded plaintiff attorney's fees and costs of $76,094.90.
 II.
 Our review of the trial court's findings of fact is guided by the clearly erroneous standard. Under this standard, we must affirm the trial court's findings of fact unless our review of the entire evidence leaves us "with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Included among the findings of fact governed by this standard is a finding of intentional discrimination. Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 The normal model for establishing a claim of intentional discrimination under Title VII consists of initial proof of a prima facie case and corresponding shifts in the burden of proof as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1981). Where the plaintiff produces direct evidence of discrimination, however, strict adherence to the McDonnell Douglas test is not required. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985). Nonetheless, the Supreme Court has approved of the general analytical framework of McDonnell Douglas to the extent that it requires the employer to articulate a nondiscriminatory rationale, such as the existence of an affirmative action plan, as the basis for a facially discriminatory decision. Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987). Whether discriminatory action taken under an affirmative action plan is challenged as an equal protection or a Title VII violation, the ultimate burden of proving the invalidity of the plan rests with the party challenging its validity. Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 277-78, 106 S.Ct. 1842, 1848-49, 90 L.Ed.2d 260 (1986) (equal protection; plurality opinion); Johnson, 107 S.Ct. at 1449 (Title VII).
 The District does not challenge the trial court's finding that the decision to retain Mr. Hunter was facially discriminatory. Instead, it urges that retaining the District's only black administrator was a decision made pursuant to a valid affirmative action plan. The trial court found no specific provision in the broad, aspirational language of the District's affirmative action plan[3] that directly controlled this decision. The District maintains that the trial court erred in its belief that the absence of a specific provision precluded reliance on the affirmative action plan as justification for the District's action. See Johnson, 107 S.Ct. at 1449 (indicating that the existence of an affirmative action plan provides only one rationale justifying discriminatory action). Although the trial court did state that the District could not rely on the plan to justify its action, it also analyzed the Board's decision "as a discrete affirmative action" or "as inferentially authorized by the existing affirmative action plan,...." R. Vol. I, Doc. 12, at 7. For these purposes, the trial court assumed the existence of a specific provision in the affirmative action plan, analyzed the Board's decision under relevant Supreme Court decisions, and concluded that "[t]he reservation of a particular position for a specific race in an affirmative action plan is invalid." Id. at 8. We therefore need not address the District's allegation of an erroneous legal conclusion by the trial court, and instead turn to consider whether the Board's action, even if made pursuant to a specific provision in an affirmative action plan, was justified by a nondiscriminatory rationale.
 The purpose of race-conscious affirmative action must be to remedy the effects of past discrimination against a disadvantaged group that itself has been the victim of discrimination.[4] United Steelworkers of Am. v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (Title VII); Wygant, 476 U.S. at 275, 106 S.Ct. at 1847 (equal protection); Regents of University of California v. Bakke, 438 U.S. 265, 300-01, 98 S.Ct. 2733, 2753-54, 57 L.Ed.2d 750 (1978). The level of proof necessary to justify the consideration of race in an employer's hiring practices, however, differs depending on whether the challenge invokes the equal protection clause or Title VII. Under Title VII, an affirmative action plan must be justified by the existence of a "manifest imbalance" in a traditionally segregated job category. Johnson, 107 S.Ct. at 1452. Once this imbalance is demonstrated, the court must also consider whether the rights of the discriminatee are "unnecessarily trammeled" by the affirmative action plan. Id. at 1455. By contrast, review of a claim of an equal protection violation is made under the more demanding "strict scrutiny" analysis, adopted by a majority of the Court in City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989); id., 109 S.Ct. at 735 (Scalia, J., joining in standard adopted by plurality). Under this standard, the preference given to minorities in the District's layoff decisions must be justified by a compelling governmental interest that is achieved only through narrowly tailored means. Wygant, 476 U.S. at 274, 106 S.Ct at 1846.[5]
 Defendant does not contend that there is any direct evidence of past discriminatory conduct by the District in its hiring practices that would justify remedial, race-conscious affirmative action. Rather, the District supports its action in this case under two arguments. First, it argues that the Board had a compelling interest to retain Mr. Hunter in order to comply with its affirmative action plan. As already noted, there was no specific provision of the District's plan that would have required it to employ at least one black social worker or administrator. Defendant relies on a series of correspondence between it and the Office for Civil Rights ("OCR") within the Department of Health, Education, and Welfare, which gave rise to the District's affirmative action plan. Defendant's Ehts. K-T. Between 1972 and 1976 the OCR monitored the District for compliance with Title VI of the 1964 Civil Rights Act. The OCR found several instances of what it believed to be noncompliance and informed the District in the spring of 1975 of specific action it would need to take in order to remain eligible for federal funds under the Emergency School Aid Act ("ESAA"). Among the action deemed necessary by the OCR was the adoption and publication of "objective non-racial, non-ethnic criteria, to be implemented prior to September 1975, for the employment, promotion, demotion, and dismissal of professional personnel which are specific enough to insure compliance with Title VI and with the ESAA regulations." Defendant's Eht. O, p. 1, at p 2. The OCR also required a commitment by the District "to employ those teacher applicants who have been refused employment on the basis of race or national origin and who may desire employment by the district." Id. at p 4. Significantly, the correspondence contained in the record is devoid of any requirement by the OCR that the District give preferential treatment to minorities in its hiring practices. Because the District took affirmative action that does not appear to have been compelled by this administrative agency, we need not consider the merits of defendant's implied argument that threat of a loss of federal funds is a compelling governmental interest for giving preferential treatment to minorities.[6] Cf. Bakke, 438 U.S. at 307-08, 98 S.Ct. at 2757 (judicial, legislative, or administrative findings of constitutional or statutory violations establishes a "substantial" governmental interest in preferring members of injured group).
 As a second argument defendant maintains that it had a compelling interest in retaining Mr. Hunter because his dismissal would have resulted in the loss of the only black administrator in the District. The District may defend its averred interest in assuring at least one position for a black administrator, however, only as a necessary measure to remedy past discrimination. Because there is no direct evidence of past or present discrimination against blacks by the District,[7] we consider whether a statistical imbalance exists that would give rise to the inference of discrimination. Croson, 109 S.Ct. at 726; Johnson, 107 S.Ct. at 1452.
 The position at issue here is a job that requires special training. Thus, our inquiry must focus on the comparison of the percentage of minorities in the School District's employment with the percentage of those in the labor force who possess the relevant qualifications. Croson, 109 S.Ct. at 725; Johnson, 107 S.Ct. at 1452. The trial court found that the only reason for the underrepresentation of blacks was the scarcity of blacks in the relevant work force,[8] and nothing in the briefs or the record gives us reason to question this finding. Given the limited number of actual positions for either social workers or administrators in the District, there is no statistical significance to be gleaned from the absence of any blacks in such a small sample when the available work force consisted of only 2% blacks.[9] The District has produced no evidence of discrimination against qualified minorities in any aspect of its operations, much less with respect to minority social workers or administrators. Croson, 109 S.Ct. at 730. No statistical disparity exists that would support the inference of past discrimination.
 Even assuming the existence of statistically significant evidence of discrimination, the District's actions fail the second prong of either a Title VII or equal protection analysis. In Johnson the Court upheld under Title VII an affirmative action plan that authorized consideration of the applicant's sex as one factor in its hiring decisions. The Court found that the plan did not "unnecessarily trammel" the rights of others by noting several factors. First, the plan "set[ ] aside no positions for women," and did not automatically exclude qualified males from consideration. 107 S.Ct. at 1455. Second, the plaintiff in Johnson had no absolute entitlement to the position that was awarded to a woman. Id. at 1455-56. Finally, the Court noted that the plan was designed to achieve rather than maintain a balanced workforce. Id. at 1456.
 Each of these factors is absent in the present case. In contrast to the plan in Johnson, the position given to Mr. Hunter was earmarked for a black person to the exclusion of all other qualified persons. Id. at 1457; see also Croson, 109 S.Ct. at 729 (absolute preference based solely on race of applicant is not a narrowly tailored means of remedying the effects of past discrimination); Bakke, 438 U.S. at 307. Second, the trial court found that plaintiff was entitled to the position given to Mr. Hunter by virtue of her seniority.[10] Third, the District's decision, which by its own terms was made to ensure employment of at least one black administrator, was intended to maintain rather than achieve a particular racial balance. See supra note 8. For the same reasons, the District's action necessarily fails the second prong of a strict scrutiny analysis. The only goal that is discernible in the District's decision to retain Mr. Hunter is that of "outright racial balancing." Croson, 109 S.Ct. at 728. The District's own affirmative action officials found no evidence of discrimination in the decision to terminate Mr. Hunter's contract, and defendant does not contended otherwise. See id. at 729 (city failed to inquire whether particular businesses had suffered from effects of past discrimination). Finally, the plurality in Wygant expressed doubt whether race-conscious layoffs, as opposed to hiring goals, can ever be deemed a narrow means of accomplishing an otherwise legitimate remedial purpose. 476 U.S. at 283, 106 S.Ct. at 1851. But see id. at 319 n. 14, 106 S.Ct. at 1871 n. 14 (Stevens, J., dissenting). Thus, the District's action is not narrowly tailored to achieve any perceived need for remedial action.
 
 III.
 
 1
 Defendant presents two interrelated arguments challenging the trial court's findings with regard to the injury suffered by plaintiff. Defendant first alleges that plaintiff would not have been rehired as a third social worker even if the District had not decided to retain Mr. Hunter. According to defendant, the only reason the District decided to create a position for a third social worker was to ensure that a black administrator would remain in the District. Therefore, if the District had not made this decision, which was motivated only by a racial purpose, defendant contends that neither plaintiff nor any other person would have been retained as a third social worker at this time.
 
 
 2
 To the extent this is construed as an allegation that plaintiff has failed to establish a prima facie case of actual discrimination, the argument must fail. The Supreme Court addressed a similar argument in Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), a suit filed under the Age Discrimination in Employment Act. In Thurston, the employer argued that plaintiffs had failed to establish a prima facie case of discrimination under McDonnell Douglas because they could not demonstrate the availability of a position at the time of the alleged discrimination. The Court rejected this argument and held that the McDonnell Douglas test establishing the elements of a prima facie case is inapplicable when a plaintiff can show direct evidence of a discriminatory motive in the employment decision. 469 U.S. at 121, 105 S.Ct. at 621; see also Furr v. AT & T Technologies, Inc., 824 F.2d 1537, 1549 (10th Cir.1987). In this case, the decision to retain Mr. Hunter solely on the basis of his race is discriminatory on its face, and a strict adherence to the McDonnell Douglas approach is therefore inappropriate.
 
 
 3
 The facts of this case also establish that plaintiff has suffered a redressable injury sufficient to refute any implied suggestion that plaintiff lacks standing. When a claim is made for a violation of equal protection resulting from discriminatory conduct, "the 'right invoked is that to equal treatment,'...." Heckler v. Mathews, 465 U.S. 728, 740, 104 S.Ct. 1387, 1395, 79 L.Ed.2d 646 (1984) (quoting Iowa-Des Moines Nat'l Bank v. Bennett, 284 U.S. 239, 247, 52 S.Ct. 133, 136, 76 L.Ed. 265 (1931)). Standing in such a case exists for " 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." Allen v. Wright, 468 U.S. 737, 755, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984) (quoting Mathews, 465 U.S. at 740, 104 S.Ct. at 1395); see Bakke, 438 U.S. at 280 n. 14, 98 S.Ct. at 2743 n. 14 (standing exists for any person who is denied opportunity to compete for positions because of race). When the District granted preferential treatment to Mr. Hunter in its layoff decisions, plaintiff received discriminatory rather than equal treatment. It is precisely such race conscious preferential treatment by the State that gives rise to equal protection concerns. "Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees." Fullilove v. Klutznick, 448 U.S. 448, 491, 100 S.Ct. 2758, 2781, 65 L.Ed.2d 902 (1980) (emphasis added); see also Wygant, 476 U.S. at 284, 106 S.Ct. at 1852 (O'Connor, J., concurring in part); Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) ("Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed.").
 
 
 4
 The trial court found that the decision to retain Mr. Hunter was made purely out of impermissible racial and ethnic considerations:
 
 
 5
 It is clear that race was the only reason for the retention of Wayne Hunter. If Connie Cunico were black, she would have been retained because the District wanted to keep a black administrator, and under their de facto seniority system she would have been entitled to the position. But because Connie Cunico was not black, she was not considered for the position the District earmarked for a black administrator.
 
 
 6
 R.Vol. I, Doc. 12, at p. 5 (Order of Aug. 19, 1988). As we understand defendant's argument, the trial court should have considered whether plaintiff would have been retained "but for" the illicit motive, rather than the alternative formulation of whether plaintiff would have been retained "but for" the color of her skin.
 
 
 7
 We are not persuaded by defendant's argument. It is true that the proscribed conduct must be the cause of the plaintiff's injury, Carey v. Piphus, 435 U.S. 247, 254-55, 98 S.Ct. 1042, 1047-48, 55 L.Ed.2d 252 (1978), and that an employer may attempt to prove that the person alleging discrimination would not have received the job even in the absence of the impermissible consideration. Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285-87, 97 S.Ct. 568, 575-76, 50 L.Ed.2d 471 (1977) (equal protection); Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ("Title VII"); E.E.O.C. v. General Lines, Inc., 865 F.2d 1555, 1559-60 (10th Cir.1989). By retaining Mr. Hunter, however, defendant obviously created a position for a third social worker. Thus, the decision actually made by the District, as opposed to a speculative assertion as to what it would have done absent the racial motivation, belies the claim that there was no position for a third social worker.[11]
 
 
 8
 Further, in our view, the alternate manner in which the trial court formulated and resolved this issue was proper. See Newport News Shipbuilding & Dry Dock v. E.E.O.C., 462 U.S. 669, 683, 103 S.Ct. 2622, 2631, 77 L.Ed.2d 89 (1983) (different insurance coverage for male and female employees violates Title VII by treating male employees with dependents " 'in a manner which but for that person's sex would be different' "); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (defendant's burden under Title VII is to rebut the prima facie showing of discrimination "by producing evidence that the plaintiff was rejected or someone else was preferred, for a legitimate, nondiscriminatory reason"; emphasis added). Assuming the validity of defendant's contention that plaintiff would have been laid off in any event, it cannot be denied that the District retained Mr. Hunter, rather than plaintiff, only by taking into consideration a singularly racial criterion. When the District made the decision to retain any social worker for a third position, it was necessarily obligated fill this position by considering only permissible nondiscriminatory factors. To accept defendant's argument would obtain the curious result of allowing employers to escape liability for discrimination by arguing that they would have hired no one if not allowed to discriminate. An employer who might be inclined to hire someone solely for racial reasons is not precluded from making the decision to hire no one, for the command of equal protection is observed either when the State terminates its preferential treatment of the person who benefits from the discrimination or when it extends such treatment to the person aggrieved. Mathews, 465 U.S. at 740, 104 S.Ct. at 1395; Hishon v. King & Spalding, 467 U.S. 69, 75, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984) (Under Title VII, "[a] benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free ... simply not to provide the benefit at all."). In this case, however, we are not presented with the option of directing the District to discontinue its preferential treatment. See Franks v. Bowman Transp. Co., 424 U.S. 747, 776, 96 S.Ct. 1251, 1270, 47 L.Ed.2d 444 (1976) (no claim made to deprive beneficiaries of the seniority status they have already received as a result of discrimination, but only to award seniority to the discriminatees). Because the violation has already taken place, the form of remedy can only be that which accords the same benefit to plaintiff.
 
 
 9
 The District's second argument is a closely related attempt to deny any actual injury to plaintiff under the "mixed motives" rule we adopted in E.E.O.C. v. General Lines, Inc., 865 F.2d 1555 (10th Cir.1989).[12] In General Lines, we held that an employer may limit its liability[13] if it can show that its employment decision was motivated by both a legitimate and an illegitimate business reason, and that it would have made the same decision even in the absence of the improper purpose. 865 F.2d at 1559-60. Defendant asserts that its decisions were motivated both by the District's legitimate financial concerns and by the race of the qualified persons. Thus, defendant claims that its decision as it relates to plaintiff must be analyzed under the mixed motives test of General Lines to determine whether it would have made the same decision even in the absence of a racially motivated purpose.
 
 
 10
 We find application of the General Lines mixed motives test inapplicable to the facts of this case. It is not the initial decision of the Board to lay off plaintiff that is the subject of the discrimination allegations. Rather, plaintiff challenges the Board's actions in retaining Mr. Hunter after the decision to terminate the contracts of all but two social workers. The trial court properly focused its analysis on the decision to retain a third social worker and determined that race was the only factor considered by the District with respect to this third position. Although the District attempted to prove that Mr. Hunter possessed other qualifications that would make him more qualified than plaintiff, the trial court apparently rejected these post facto pretextual justifications. This case is more appropriately considered as a "pretext" case, in which the plaintiff has proven that only an impermissible consideration induced the relevant employment decision. See Price Waterhouse, 109 S.Ct. at 1789 n. 12; id. at 1795-96 (White, J., concurring in the judgment). We have no basis for questioning the trial court's findings that the race of the social workers was "the 'true' motive behind the decision" to retain Mr. Hunter rather than plaintiff. NLRB v. Transportation Management Corp., 462 U.S. 393, 400 n. 5, 103 S.Ct. 2469, 2473 n. 5, 76 L.Ed.2d 667 (1983). Thus, there are no mixed motives in this case that would require a remand for the trial court's consideration under this analysis.
 
 
 11
 We must be mindful that an important purpose of Title VII is to make persons whole for the injuries they have suffered as the result of unlawful employment discrimination. Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Further, "[w]here racial discrimination is concerned, 'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' " Id. (quoting Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965)); see also Pitre v. Western Elec. Co., 843 F.2d 1262, 1274 (10th Cir.1988). The District contends that an award of backpay results in a windfall to plaintiff because it would not have retained her even if it had not discriminated. We reject this argument. The right at issue in this case is the constitutional and statutory guarantee of nondiscriminatory, equal treatment, and the effects of the violation of this right must be remedied to the fullest and most practical extent possible. Through its preferential hiring practice, the District gave to another person, solely on the basis of that other person's race, a position to which plaintiff was entitled. As the trial court found, plaintiff would have been retained as a third social worker if she had been black. In addition, a denial of backpay to plaintiff would leave the parties in the same unequal position as they would be if the District were allowed to discriminate. The remedy of backpay does not constitute a windfall to plaintiff, see Carey, 435 U.S. at 260, 98 S.Ct. at 1050, nor does it award damages based on some amorphous inherent value of her constitutional right to equal protection. Cf. Memphis Community School Dist. v. Stachura, 477 U.S. 299, 308, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986) (violation of constitutional rights can be remedied only through actual compensatory damages). Although no award can fully compensate plaintiff for her personal right to equal protection once denied, Franks, 424 U.S. at 776, 96 S.Ct. at 1270, the award of backpay corresponds most accurately to the injury suffered. Because we find no error in the trial court's award of backpay with respect to the decision to retain Mr. Hunter, we do not address the trial court's finding that the District also discriminated by hiring Mr. Armijo.
 
 IV.
 
 12
 Plaintiff has filed a separate appeal challenging the trial court's denial of costs for expenses incurred by plaintiff in hiring an expert to testify at the attorney fee hearing. Plaintiff's notice of appeal states only that her appeal "is being taken concerning the Court's decision concerning Plaintiff's 'lodestar' attorney fee award and its enhancement." R.Vol. I, Doc. 19. Plaintiff has since withdrawn this challenge.
 
 
 13
 Our appellate review is limited to final judgments or parts thereof that are designated in the notice of appeal. Fed.R.App.P. 3(c); Averitt v. Southland Motor Inn of Oklahoma, 720 F.2d 1178, 1180 (10th Cir.1983). Plaintiff clearly intended to appeal only a portion of the trial court's order respecting damages and fees, and our jurisdiction does not extend to other matters of the judgment that plaintiff may now wish to appeal. Averitt, at 1181.
 
 
 14
 Plaintiff also asks us to award sanctions in the form of attorney's fees and costs against defendant for a frivolous appeal. Under Fed.R.App.P. 38, a court of appeals may order "just damages, including attorney fees, and single or double costs if the court determines that an appeal is frivolous or brought for purposes of delay." Braley v. Campbell, 832 F.2d 1504, 1510 (10th Cir.1987); see also 28 U.S.C. Sec. 1927. To recover attorney's fees, the prevailing party "must show that the appeal was undertaken in bad faith or as a frivolous, unreasonable, or groundless action." U.S. Industries, Inc. v. Touche Ross & Co., 854 F.2d 1223, 1244 (10th Cir.1988). This determination focuses on whether the attorney's conduct, "viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." Braley, at 1512.
 
 
 15
 We do not find the District's appeal to be so groundless as to warrant a finding of objective bad faith. This is particularly true given the difficult and often confusing standards that have characterized so many of the Supreme Court's pronouncements regarding discrimination. Accordingly, we deny plaintiff's motion for sanctions.
 
 
 16
 The district court's judgment is AFFIRMED.
 
 
 
 *
 The Honorable Frank G. Theis, District Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 Our decision takes into consideration the supplemental authorities submitted by plaintiff-appellee after oral argument. Defendant-appellant urges us to strike this submission for failure to comply with Fed.R.App.P. 28(j), because the citations are not referenced "to the page of the brief or to a point argued orally" and also because the cited authorities were available at the time the briefs were submitted. Rule 28(j) allows for the submission of additional authority that has "come to the attention of a party after the party's brief has been filed, or after oral argument but before decision,...." This language does not require that the supplemental authority be unavailable at the time of the briefing, and we decline to limit the permissible reasons for which an additional authority may come to counsel's attention. Because plaintiff-appellee has not directed our attention to the portion of her argument to which these authorities pertain, we will consider them only to the extent that they appear to have obvious relevance
 
 
 [2]
 The trial court found against plaintiff on her breach of contract claim, reasoning that a cancellation caused by financial exigencies in the District was an implied provision of plaintiff's annual agreement. R.Vol. I, Doc. 12, at 9. Plaintiff does not challenge this finding and accordingly we do not review it here
 
 
 [3]
 The trial court's findings of fact and conclusions of law referred to the following sections of the District's 1981-82 version of its affirmative action plan:
 School District 60 has two long-range goals in its Affirmative Action Plan. The first is to achieve a diverse, multi-racial faculty and staff capable of providing excellence in the education of its students and for the welfare and enrichment of the community. The second long-range goal is to achieve equity for all individuals through equal employment opportunity policies and practices. The district shall actively promote equal employment opportunity by pursuing the following specific objectives:
 
 
 [1]
 Work toward an equitable balance of women, men and minority employees to reflect the community population on a district wide basis
 
 
 [2]
 Achieve a balance in areas of deficiency of women, men and minority employees according to Labor Market Availability for each job classification
 
 
 [3]
 Provide equal employment and advancement opportunities for both women, men and minorities
 Defendant's Eht. Y, at p. 5. The second portion of the District's plan examined by the trial court stated:
 
 
 [1]
 The district shall make a concerted effort to employ minority persons in certified positions which positions involve the delivery of service to the district's students. The ultimate goal of the plan shall be to hire, between school years 1981-82 and 1990-91, minorities in certified positions to the degree that they will represent from between 33% (minority representation in the Pueblo community) and 45% (student minority representation in the district)
 Defendant's Eht. Y, at p. 19.
 
 
 [4]
 The only exception to this purpose that is recognized by a majority of the Supreme Court was recently announced in Metro Broadcasting, Inc. v. F.C.C., --- U.S. ----, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990). The Court held that benign race-conscious measures mandated by Congress, although not remedial, are constitutionally permissible if they serve important governmental objectives and are substantially related to those objectives. Id. 110 S.Ct. at 3009. Needless to say, the type of detailed legislative and administrative findings that supported the constitutionality of the regulations at issue in Metro Broadcasting are entirely absent in this case. See also Bakke, 438 U.S. at 302 n. 41, 98 S.Ct. at 2754 n. 41
 
 
 [5]
 Because plaintiff has made both equal protection and Title VII claims, defendant may prevail on this appeal only if its conduct can pass muster under the more probing strict scrutiny analysis. Although courts normally avoid resolution of constitutional issues when the case may be decided on nonconstitutional grounds, Jean v. Nelson, 472 U.S. 846, 854, 105 S.Ct. 2992, 2996, 86 L.Ed.2d 664 (1985), the interrelatedness of the constitutional and statutory issues in this case persuade us to review the trial court's conclusions under both the constitutional and statutory standards
 
 
 [6]
 The OCR also required that the District adopt a timetable of target goals for minority employment that would be "based upon a reasonable assessment of the availability of minority applicants." Defendant's Eht. L, p. 4, item 2. The District's response to this requirement was the promulgation of specific goals for attaining a percentage of minorities in the District's workforce that would reflect the percentage of minorities within the Pueblo community and student population. Defendant's Eht. V, p. 6; Eht. W, pp. 6-7; Eht. X, p. 6. Cf. Hazelwood School Dist. v. United States, 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) (disparity between minority student population and racial composition of teaching staff is not a relevant comparison in determining remedial need for discriminatory affirmative action); Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989) (racial imbalance in workforce is insufficient to make out a case of disparate treatment). The specific actions upon which the OCR conditioned further federal funding, however, did not include the achievement of these goals through preferential hiring practices. Indeed, the OCR required that the District adopt nondiscriminatory employment criteria. Defendant's Eht. O, p. 1, at p 2. Regardless of the existence of these hiring goals, the District's various affirmative action plans do not appear to mandate or even authorize achievement of these goals through discriminatory hiring practices. See Johnson, 107 S.Ct. at 1464 (O'Connor, J., concurring in the judgment) (employer would violate Title VII if it applied to its hiring decisions the stated long-term goal of attaining a workforce whose composition approximates distribution of all women in the area workforce); Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 1803, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring in the judgment) (quoting 110 Cong.Rec. 7213 (1964))
 
 
 [7]
 In 1975 the OCR did find evidence of direct discrimination in that the District had assigned its five minority principals to schools having the highest minority enrollments. Defendant's Eht. L, at p. 4. The District remedied this situation by transferring one of these principals to a school with low minority enrollment. Defendant's Eht. T. The OCR also found unspecified instances of actual discriminatory hiring decisions and required that District extend job offers to those teachers who had been denied employment on the basis of race. Defendant's Eht. L, at p. 4
 
 
 [8]
 The trial court did not specify whether it considered the relevant workforce to consist of persons qualified for all professional positions within the District, for only administrator positions, or for only social worker positions. See Hazelwood, 433 U.S. at 308, 97 S.Ct. at 2741 (proper comparison for claim of discrimination in teaching positions must be between school's actual teaching staff and the racial composition of qualified public school teachers in the relevant market); see also Wards Cove, 109 S.Ct. at 2122-23 (racial imbalance in one area of employer's workforce does not establish discrimination in another area). Nor do the trial court's findings of fact and conclusions of law indicate the relevant geographic market that it used to determine this figure. We have no occasion to review this finding, however, because defendant does not question the validity of the statistics used by the trial court. See Washington v. Electric Joint Apprenticeship & Training Comm., 845 F.2d 710, 715 (7th Cir.1988) (failure to raise statistical argument before district court in discrimination case waives this argument on appeal)
 
 
 [9]
 At trial the District urged that its social workers be considered as "administrators," which it believed would justify its motivation in retaining Mr. Hunter as the "only black administrator" in the District. The trial court stated its belief that "administrator" was a meaningless word in this case, (R.Vol. IV, at 287), presumably because of the apparent arbitrariness of classifying social workers, who had no administrative duties, within this group. Even adopting the District's classification, 2% of the 89.5 total number of administrators before the layoffs would yield an expected number of only 1.8 black administrators. There is no indication in the record of the number of administrative positions remaining after the layoffs
 
 
 [10]
 In an attempt to refute this finding, the District devotes a good deal of energy to distinguishing between "de facto tenure," which it apparently believes is necessary for plaintiff to prevail, and "de facto seniority." Whatever the conceptual difference between these two classifications, the finding of the trial court was that the District implemented its layoff policy according to endorsements and the seniority of the personnel within each endorsement. Although plaintiff may have had no contractual right to her job, nor a "de facto tenure" that would accord her a constitutional right against dismissal, the District's own policy entitled her to employment if a third position was opened for any social worker. Moreover, even if we were to question the trial court's finding regarding the existence of a de facto policy of seniority layoffs, and we perceive no reason to do so, the issue in this case does not concern the legality of layoffs that deviate from a seniority classification; it is the validity of using suspect classifications in determining who shall retain their jobs and who shall not. As the plurality stated in Wygant: "The Constitution does not require layoffs to be based on strict seniority. But it does require the State to meet a heavy burden of justification when it implements a layoff plan based on race." 476 U.S. at 282 n. 10, 106 S.Ct. at 1851 n. 10
 
 
 [11]
 During closing argument, defendant's counsel conceded the possibility that plaintiff might have been retained if Mr. Hunter had not been a social worker, but rather some other type of administrator. R.Vol. IV, at 506
 
 
 [12]
 Plaintiff questions whether defendant has preserved this issue for appeal by raising it in the trial court. General Lines, however, was not decided at the time of the trial or the district court's decision, and defendant obviously could not have cited to this case or to the "mixed motives" terminology that it employed. It should also be noted that defendant did raise this argument in its pretrial motion by urging this same analysis under Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), which established for equal protection claims the "other rationale" burden shift that we ultimately adopted in General Lines for Title VII claims. Thus, we address this argument on the merits
 
 
 [13]
 We note that the liability limiting aspect of our decision in General Lines was rejected shortly thereafter by a plurality of the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In Hopkins the plurality ruled that once a Title VII plaintiff has proven an illicit factor as a motivating part in the employer's decision, the employer may avoid all liability if it can prove that it would have reached the same decision even in the absence of the illegal purpose. Id., 109 S.Ct. at 1787-88 & n. 10. This holding does not affect our decision in this case, however, where we find the mixed motives analysis to be inapplicable