UNITED STATES of America, Plaintiff,

v.

BOARD OF EDUCATION OF the TOWNSHIP OF PISCATAWAY, Defendant.

Sharon TAXMAN, Plaintiff–Intervenor,

v.

BOARD OF EDUCATION OF the TOWNSHIP OF PISCATAWAY, Defendant.

Civ. A. No. 92–340(MTB).

United States District Court, D. New Jersey.

Sept. 10, 1993.

Michael Chertoff, U.S. Atty., D.N.J. by Susan Cassell, Newark, NJ and Steven H. Schlesinger, U.S. Dept. of Justice, Washington, DC, for plaintiff.

Rubin, Rubin, Malgran & Kuhn by David B. Rubin, Piscataway, NJ, for defendant.

Klausner, Hunter & Cige by Stephen E. Klausner, Somerville, NJ, for plaintiff-intervenor.

## OPINION

BARRY, District Judge.

### I. INTRODUCTION

This case involves a challenge by the United States, as plaintiff, and Sharon Taxman, as intervenor, to an affirmative action plan adopted by the Board of Education of Piscataway Township ("Board"). Plaintiff and Taxman claim that Taxman, a white female employed as a teacher by the Board in the Business Education Department of Piscataway High School, was laid off instead of Debra Williams, a black female employed as a teacher in the same department, solely on the basis of race. Both the plaintiff and Taxman have brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Taxman has brought an additional claim under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 *et seq.*[1] Discovery has closed and

---

1. The Board previously brought a motion to dismiss Taxman's NJLAD claims claiming that they were barred by the NJLAD's two-year statute of limitations. The court initially denied the Board's motion, holding that the NJLAD had a six-year statute of limitations. *United States v. Board of Education of Piscataway Township*, 798 F.Supp. 1093 (D.N.J.1992). Upon a motion for reconsideration by the Board in light of an intervening decision by the Appellate Division of the Superior Court of New Jersey, the court modified its previously ruling. Thus, consistent with *Montells v. Haynes*, 258 N.J.Super. 563, 610 A.2d 898 (App.Div.1992), the court held that Taxman's claims for compensatory and emotional damages and her claims for pain, suffering, and humiliation were time barred under a two-year statute of limitations. *United States v. Board of Education of Piscataway Township*, No. 92–340(MTB) (D.N.J. November 12, 1992) (unpublished Order).

Since the court granted the Board's motion for reconsideration and during the pendency of the instant motions, the Supreme Court of New Jersey has affirmed in part and reversed in part the Appellate Division's decision in *Montells. Montells v. Haynes*, 133 N.J. 282, 627 A.2d 654 (1993), clarifying the statute of limitations issue in NJLAD cases in important respects. First, the

court held that all NJLAD claims should be subject to a single statute of limitations regardless of whether economic damages or personal injury damages are sought. *Id.* at 290–91, 627 A.2d at 658. Second, the court held that NJLAD claims, like their federal counterparts, should be subject to a two-year statute of limitations. *Id.* at 291–93, 627 A.2d at 658–59.

Finally, and importantly here, the court held that the rule it announced, i.e. that NJLAD claims should be subject to a two-year statute of limitations, should apply prospectively only. *Id.* at 294–96, 627 A.2d at 660–61. In this regard, the court stated:

> The state of the law on the applicable statute of limitations under LAD was sufficiently murky to justify plaintiff's reasonable reliance on the six-year period. In addition, the Legislature has directed a liberal reading of LAD to afford the greatest protection to victims of discrimination. On balance, we conclude that our decision today should apply purely prospectively. Consequently, it applies only to cases in which the operative facts arise after the date of the decision ... Our decision does not apply to this case, pending cases, or to cases the operative facts of which arose before the date of this decision.

there are few factual disputes between the parties. The Board has moved for summary judgment and plaintiff and Taxman have cross-moved for partial summary judgment as to liability. Because there is no legal justification for the race-conscious affirmative action plan at issue in this case and because that plan unnecessarily trammels on the rights of nonminorities, the Board's motion for summary judgment will be denied and plaintiff and Taxman's cross-motion will be granted.

## II.  BACKGROUND

The relevant facts are almost entirely undisputed and, except where otherwise cited, have been stipulated by the parties.[2]

### A.  *The Board's Affirmative Action Program and Policy*

In May, 1975, the New Jersey State Board of Education adopted a regulation requiring each school district "to develop a policy of equal education opportunity" and adopt by board resolution two affirmative action plans, one pertaining to classroom practices and the other pertaining to employment practices. N.J.A.C. 6:4–1.3(a)–(b). Pursuant to this regulation, the Piscataway Township Board adopted a program called "Affirmative Action Program to Eliminate Discrimination on the Basis of Sex, Race, Religion or National Origin". The program contained the following "Statement of Purpose":

> The Piscataway Township Board of Education believes that each student is entitled to equal educational opportunity and that all qualified persons are entitled to equal employment opportunities.

> The affirmative action program is a set of specific procedures to which the Board of Education commits itself to apply every good faith effort. The objective of these procedures is to provide equal educational opportunity for students and equal employment opportunity for employees and prospective employees.

> The basic purpose of the program is to make a concentrated effort to attract women candidates for administrative and supervisory positions and minority personnel for all positions so that their qualifications can be evaluated along with other candidates. In all cases, the most qualified candidate will be recommended for appointment. However, *when candidates appear to be of equal qualification, candidates meeting the criteria of the affirmative action program will be recommended.* (emphasis added).

The phrase "candidates meeting the criteria of the affirmative action program" as used in the Statement of Purpose means all individuals identified as minorities for statistical purposes by the New Jersey Department of Education. The Board's purpose in adopting this language was to grant a preference in hiring to minority candidates, hence the directive that in cases in which two or more candidates are equally qualified, the minority candidate is to be selected.

There is no dispute that the Board did not adopt its 1975 Affirmative Action Program in order to remedy the results of prior discrimination or to rectify an identified under-representation of minorities within the Piscataway school system. No charges of race based discrimination had been filed with any state or federal agency against the Board or any of its employees prior to the adoption of the 1975 Affirmative Action Program. Indeed, there is not even a suggestion that the Board had ever intentionally discriminated against any employee or applicant for employment on the basis of race. Moreover, at the time the Affirmative Action Program was adopted, the statistical reports required by the New Jersey Department of Education showed no

---

*Id.* Finding that Montells' reliance on a six-year statute of limitations was reasonable, the Supreme Court remanded the case to the Law Division. *Id.*

The effect of the Supreme Court's *Montells* decision on the case *sub judice* is clear. The court will apply a six-year statute of limitations to all of Taxman's NJLAD claims. Accordingly, Taxman's claims for compensatory and emotion-al damages, as well as those for pain, suffering, and humiliation are hereby reinstated.

2. The parties, in their stipulated facts, refer at times to "blacks" and at times to "minorities". Because it is not entirely clear whether the parties meant to utilize those terms interchangeably, the court will utilize the reference utilized by the parties at the particular point under discussion.

underrepresentation of black employees in the reporting categories required by the State.

In 1976, the Board adopted an addendum to the Affirmative Action Program. This document, entitled "Employment Practices Addendum", contained an analysis of minority and female employment across various job categories in Piscataway public schools. With respect to the job category of "professionals", which includes teachers, the statistics listed in the document indicate that while minorities comprised 7.4% of the statewide[3] pool of persons with the requisite skills for professional positions, 10% of the Board's work force in this category were minorities. The document concludes that "the Piscataway School District is not under-utilizing Minorities in any job category when compared with EEOC Labor Force Area data".

In April, 1983, the Board adopted an affirmative action policy. The stated purpose of this policy, entitled "Affirmative Action—Employment Practices", was as follows:

> This policy ensures equal employment opportunity for all persons and prohibits discrimination in employment because of sex, race, color, creed, religion, handicap, domicile, marital status, or national origin. In all cases, the most qualified candidate will be recommended for appointment. However, *when candidates appear to be of equal qualification, candidates meeting the criteria of the affirmative action program will be recommended.* (emphasis added).

The parties agree that the phrase "candidates meeting the criteria of the affirmative action program" had the same meaning as it did in the 1975 Affirmative Action Program. As was the case in 1975, when the Board adopted this policy in 1983 it had no knowledge or evidence of any past or continuing discrimination against blacks with respect to the employment of teachers. Similarly, it had not conducted a new statistical analysis

of its work force and had no information indicating any underutilization or underrepresentation of blacks in its teacher work force.

In January, 1985, the Board adopted a second addendum to its 1975 program. This addendum divided the Board's work force into ten job categories and broke down the number of employees in each category by race, national origin, and sex. It compared the percentage of available minorities in the Middlesex County labor market with the percentage of minorities employed by the Board in each job category. The comparison of the percentages for the job category of "Educational Professionals", 90% of which were teachers, revealed that while 5.8% of the available labor market in Middlesex County was black, 9.5% of the educational professionals employed by the Board were black. Moreover, the addendum's analysis of underutilization in each of the job categories by race, national origin, and sex indicated that because the percentage of black educational professionals employed by the Board exceeded the percentage of blacks in the Middlesex County labor market, there was no underutilization of blacks in the Board's teacher work force. Thus, the Board did not establish any goal with respect to hiring additional black teachers. The analysis contained in this second addendum was the last such analysis prior to the termination of Taxman in 1989.

## B. *The Decision to Terminate Taxman*

Sharon Taxman, a white female, was hired by the Board as a business education teacher commencing September 1, 1980. Taxman had a bachelor's degree, three years prior teaching experience, and an instructional certificate from the New Jersey State Department of Education which authorized her to teach courses in the areas of secretarial studies, bookkeeping, accounting, typing, and general business. Debra Williams, a black female, was also hired by the Board com-

---

**3.** Although the percentage of minorities qualified to hold the Board's "professional" positions is a statewide number, for positions other than "officials/administrative" and "professional" the number of qualified candidates related only to Middlesex County, New Jersey. In a subsequent letter to the Board, the Office of Equal Employ-

ment Opportunity of the New Jersey State Department of Education stated that in future comparisons, the Board was to use Middlesex County percentages for females and minorities if those percentages were higher than the statewide percentages.

mencing September 1, 1980. At the time she was hired, Williams had a bachelor's degree, one year prior teaching experience, and an instructional certificate authorizing her to teach courses in the areas of typing and secretarial studies. In 1985, Williams became certified to teach courses in business education. Both Taxman and Williams remained employed by the Board in the Business Education Department at Piscataway High School from the 1980–81 school year through the 1988–89 school year. As a result, the Board's calculation of seniority for Taxman and Williams indicated that each had nine years seniority in typewriting and secretarial studies, while in general business and bookkeeping and accounting Taxman had nine years seniority compared to Williams' four years and three months seniority. The bottom line is undisputed: Taxman and Williams were in a seniority tie.

In the Spring of 1989, Burton Edelchick, the Superintendent of Schools, recommended to the Board that it reduce the teaching staff in its Business Education Department. As Superintendent of Schools, Edelchick was in charge of the day-to-day activities of the Piscataway School District. His responsibilities included making recommendations to the Board concerning the hiring, reappointment, discharge, transfer, and assignment of teachers. Although the Board was responsible for approving or disapproving his recommendations as to the hiring, reappointment, or termination of teachers, Edelchick could not recall a single instance in his sixteen years as Superintendent of Schools in which his recommendation regarding the hiring or firing of a teacher was not followed. By letter dated April 24, 1989, Gordon Moore, the Board's Director of Personnel, advised Taxman that the Board would be discussing a reduction in force within the Business Education Department for the 1989–90 school year and that, because she was tied in seniority with another teacher, her employment could possibly be terminated.[4]

At private sessions on April 27 and May 18, 1989, the Board discussed Edelchick's recommendation that the teaching staff in the Business Education Department be reduced. At the May 18th meeting, the Board also discussed possible methods of breaking the tie in seniority between Taxman and Williams. Although the option of breaking the tie by drawing lots, as had been done to break all such ties in the past, was considered, that option was rejected. Edelchick recommended to the Board that it use the 1983 Affirmative Action policy as a tiebreaker knowing that Williams was black and Taxman was white and that application of the policy would result in the termination of Taxman and the retention of Williams. Edelchick's recommendation was based on his belief that Taxman and Williams were tied in seniority and equally qualified, and because Williams was the only black teacher in the Business Education Department. The Board informally decided to use the 1983 Affirmative Action policy to break the tie.

At its regular public meeting on May 22, 1989, the Board formally voted to abolish one teaching position in the Business Education Department of Piscataway High School. Using its 1983 Affirmative Action policy as the seniority tie-breaking method, it then voted to terminate Taxman effective June 30, 1989. In his May 22, 1989 letter to Taxman, Gordon Moore described the Board's reasons for acting as it did:

> [T]he board of education has decided to rely on its commitment to affirmative action as a means of breaking the tie in seniority entitlement in the secretarial studies category. As a result, the board, at its regular meeting on the evening of May 22, 1989, acted to abolish one teaching position and to terminate your employment as a teaching staff member effective June 30, 1989.

It is undisputed that when the Board terminated Taxman in May, 1989, it had no specific intent to remedy any prior discriminatory act, practice, or pattern. It is similarly undisputed that had Taxman been retained and Williams been terminated, no underrep-

4. Under N.J.S.A. 18A:28–10, dismissals pursuant to reductions in force must be made on the basis of seniority.

resentation of blacks in the teaching work force as a whole would have resulted.

As noted at the outset, the United States and Taxman now challenge the propriety of the Board's decision under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.* The Board has moved for summary judgment as to the claims of the United States and Taxman and both the United States and Taxman have cross-moved for partial summary judgment on the issue of liability.[5]

## III. *DISCUSSION*

Summary judgment will be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed.R.Civ.P. 56(c). Which facts are "material" depends on the substantive law being applied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, in order to be "material", a fact must be such that it could affect the outcome under the governing substantive law. *Id.* In addition, a factual dispute will not preclude summary judgment unless it is "genuine", that is, the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* If the evidence of the nonmovant is merely colorable or not particularly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. at 2510–11. Finally, in passing on such a motion, the court is not at liberty to weigh evidence or resolve factual disputes. *Id.* at 249, 255, 106 S.Ct. at 2510, 2513; *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991). Rather, the court is bound to view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir. 1992).

The claims of employment discrimination on the basis of race brought by plaintiff and Taxman are properly analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Johnson v. Transportation Agency, Santa Clara County,* 480 U.S. 616, 626, 107 S.Ct. 1442, 1448, 94 L.Ed.2d 615 (1987). There is no dispute that plaintiff and Taxman have established a *prima facie* case; indeed, the Board's concession that it took race into account in making the employment decision is sufficient in and of itself to establish a *prima facie* case. *Higgins v. Vallejo,* 823 F.2d 351, 355 (9th Cir. 1987), *cert. denied,* 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989). The burden,

---

5. Although the United States seeks redress solely under federal law while intervenor Taxman seeks redress under both federal law and New Jersey state law, the state law claims presented need not be analyzed separately from the federal claims. Neither the Supreme Court of New Jersey nor the state's lower courts have considered the issues *sub judice.* On several occasions, however, the Supreme Court has expressed its approval of the federal antidiscrimination law developed under Title VII. *See Grigoletti v. Ortho Pharmaceutical Corp.,* 118 N.J. 89, 97, 570 A.2d 903 (1990); *Shaner v. Horizon Bancorp,* 116 N.J. 433, 437, 561 A.2d 1130 (1989); *Peper v. Princeton University Board of Trustees,* 77 N.J. 55, 81, 389 A.2d 465 (1978). Moreover, it has adopted the federal courts' familiar *McDonnell Douglas* framework for allocating the burdens of production and persuasion in NJLAD cases. *See Clowes v. Terminix Int'l, Inc.,* 109 N.J. 575, 595–96, 538 A.2d 794 (1988); *Andersen v. Exxon Co., U.S.A.,* 89 N.J. 483, 492, 446 A.2d 486 (1982); *Goodman v.*

*London Metals Exchange, Inc.,* 86 N.J. 19, 31, 429 A.2d 341 (1981). It likewise has followed the *McDonnell Douglas* framework in cases involving reverse discrimination. *See Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 551–54, 569 A.2d 793 (1990).

The parties do not suggest that an analysis of Taxman's NJLAD claims would differ in any way from the Title VII claims. This court agrees. Moreover, there is nothing which suggests that the Supreme Court of New Jersey might alter its practice of looking to Title VII standards for guidance in discrimination cases. As the Supreme Court has stated, "where [Title VII] standards are useful and fair, it is in the best interests of everyone concerned to have some uniformity in the law". *Peper,* 77 N.J. at 81, 389 A.2d 465. Therefore, the cross-motions for summary judgment pertaining to the claims under Title VII and Taxman's claims under the NJLAD will be considered simultaneously under the same legal standards.

therefore, shifts to the Board to articulate a legitimate, nondiscriminatory reason for its action. *Id.* "The existence of an affirmative action plan provides such a rationale". *Id.* The Board having met its burden of production, the burden shifts back to plaintiff and Taxman to show that the plan is invalid. *Id.* Plaintiff and Taxman at all times bear the burden of proving the plan's invalidity. *Id.*

### A. Supreme Court Authority on Reverse Discrimination Under Title VII: Weber and Johnson

This court's analysis of the Board's affirmative action plan must begin with the Supreme Court's decision in *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). The Court in *Weber* considered the legality of an affirmative action plan which was adopted pursuant to a collective bargaining agreement. The plan reserved for black employees 50% of the openings in an in-plant training program designed to train unskilled production workers to become craftworkers until such time as the percentage of black craftworkers was commensurate with the percentage of blacks in the labor force. *Id.* at 198–99, 99 S.Ct. at 2725. Aside from the 50% of the openings reserved for black employees, workers were selected for the training program on the basis of seniority. A white employee instituted a class action complaining that because the plan resulted in the admission to the training program of black employees with less seniority than some white employees who were denied admission, it violated Title VII. *Id.* at 199, 99 S.Ct. at 2725.

The Supreme Court characterized the issue before it as follows: "The only question before us is the narrow statutory issue of whether Title VII *forbids* private employers and unions from voluntarily agreeing upon bona fide affirmative action plans that accord racial preferences in the manner and for the purpose provided in the Kaiser–USWA plan". *Id.* at 200, 99 S.Ct. at 2725 (emphasis in original). The Court rejected the employees' narrow, literal reading of Title VII and read that statute in light of its legislative history and the historical context in which it

arose to conclude that it was not intended to be an absolute prohibition against all private, voluntary, race-conscious affirmative action programs. *Id.* at 201–08, 99 S.Ct. at 2726–30.

Having concluded that Title VII does not prohibit all voluntary, race-conscious affirmative action programs by private employers, the Court stressed that its inquiry was limited in scope: "We need not today define in detail the line of demarcation between permissible and impermissible affirmative action plans". *Id.* at 208, 99 S.Ct. at 2729–30. In determining that the specific plan at issue was permissible under the statute, the Court noted that the plan served the same purpose as Title VII: "to break down old patterns of racial segregation and hierarchy". *Id.* The Court also opined that the plan did not "unnecessarily trammel" the interests of white employees as it did not require that white workers be terminated and replaced with black workers or create an absolute bar to the advancement of white employees. *Id.* In addition, the plan was a temporary measure designed to eliminate a racial imbalance rather than to maintain a racial balance. The Court concluded that the plan "falls within the area of discretion left by Title VII to the private sector voluntarily to adopt affirmative action plans designed to eliminate conspicuous racial imbalance in traditionally segregated job categories". *Id.* at 209, 99 S.Ct. at 2730 (footnote omitted).

The Supreme Court entertained a similar question with respect to a public employer in *Johnson.* At the outset, the majority rejected the position advocated by Justice Scalia in dissent that the obligations of a public employer under Title VII are the same as its obligations under the Constitution. 480 U.S. at 627 n. 6, 107 S.Ct. at 1449 n. 6. The Court thus rejected the notion that the strict scrutiny under which constitutional challenges to affirmative action plans are analyzed, *see Wygant v. Jackson Board of Education*, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) and, later, *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), should likewise govern challenges to public employers' plans pursuant to Title VII. *Id.* ("The fact that a

public employer must also satisfy the Constitution does not negate the fact that the *statutory* prohibition with which that employer must contend was not intended to extend as far as that of the Constitution".) (emphasis in original). Having declined to apply strict scrutiny, the Court considered the affirmative action plan before it in light of *Weber*.

The *Johnson* Court had before it an affirmative action plan adopted by the Transportation Agency of Santa Clara County, California. As relevant to the case before the Court, the plan authorized the agency to consider as one factor the sex of applicants for promotion to positions within traditionally segregated job classifications in which women had been underrepresented. *Id.*, 480 U.S. at 620–21, 107 S.Ct. at 1446. The petitioner in *Johnson* was a male employee who had applied for the promotional position of road dispatcher, which position was eventually given to a woman applicant. Both the petitioner and the woman who was promoted were deemed well qualified for the position, and petitioner had scored slightly higher in the first round interview. The decisionmaker for the agency indicated that in reaching the decision to promote the woman candidate, he had considered the candidates' qualifications, backgrounds, test scores, and expertise as well as affirmative action. *Id.* at 625, 107 S.Ct. at 1448.

The majority in *Johnson* closely tracked the Court's decision in *Weber* in considering whether the affirmative action plan at issue was lawful. The Court considered first whether the plan was justified by a "manifest imbalance" such that women were underrepresented in "traditionally segregated job categories", noting that this requirement ensures that affirmative action plans will be consistent with Title VII's purpose of eliminating the effects of employment discrimination and will not unduly infringe on the rights of nonminority employees. *Id.* at 631–32, 107 S.Ct. at 1451–52 (quoting *Weber*, 443 U.S. at 197, 99 S.Ct. at 2724). Noting that in addition to its long term objective of a work force that mirrored the percentage of women in the area labor market, the plan also mandated that annual goals for female hiring be formulated in light of such factors as the number of openings and the availability of qualified women in the labor force, goals more properly categorized as aspirations than quotas, the court found the requisite manifest imbalance to justify an affirmative action plan. Important, too, to this finding was the fact that blind hiring based on statistics alone was not authorized under the plan. Rather, the plan required that female applicants' qualifications for particular positions be taken into account in setting hiring goals as well as in making hiring decisions. *Id.*, 480 U.S. at 636–37, 107 S.Ct. at 1454–55.

The *Johnson* Court's second inquiry was whether the plan under scrutiny unnecessarily trammeled the rights of male employees or created an absolute bar to the advancement of male employees. The Court found that numerous factors militated in favor of a conclusion that the plan also satisfied this prong of *Weber*. First, sex was but one of numerous factors considered in deciding which employee to promote. The Court likened this to the treatment of race as a "plus" factor in the "Harvard Plan" referenced approvingly by Justice Powell in *Regents of University of California v. Bakke*, 438 U.S. 265, 316–19, 98 S.Ct. 2733, 2761–63, 57 L.Ed.2d 750 (1978). *Johnson*, 480 U.S. at 638, 107 S.Ct. at 1455. Because sex was but one factor to be considered, no applicant would be automatically excluded from consideration based on sex. *Id.* at 638, 107 S.Ct. at 1455. Second, the petitioner had no legitimate, firmly rooted expectation in being promoted. *Id.* Third, the plan was implemented merely to attain, as opposed to maintain, a balanced work force. *Id.* at 639, 107 S.Ct. at 1455. Finally, the court did not find troublesome the plan's lack of an express assurance that it was temporary because the agency's demonstrably moderate and gradual approach to eliminating the imbalance in its work force combined with its commitment to attaining a balance were sufficient to indicate to the Court that the plan was only a temporary measure. *Id.* at 640, 107 S.Ct. at 1456. Finding that both concerns expressed in *Weber* had been satisfied, the Court concluded that the agency's plan did not run afoul of Title VII.

The Court's holdings in *Weber* and *Johnson* teach that the inquiry in determining whether a voluntary, race-conscious employment decision violates Title VII is twofold. Drawing on the structure of *Weber*'s analysis, the Court in *Johnson* stated the first prong of this inquiry as follows: "[W]e must first examine whether [the employment] decision [challenged] was made pursuant to a plan prompted by concerns similar to those of the employer in *Weber*". *Johnson*, 480 U.S. at 631, 107 S.Ct. at 1451. This prong can be more simply described as an inquiry into the purpose or purposes for which a particular plan was adopted. The second prong, as expressed by the *Johnson* Court, is "whether the effect of the Plan on males and nonminorities is comparable to the effect of the plan in [*Weber*]". *Id.* This step requires a determination as to whether the particular plan "unnecessarily trammels" the rights of male and nonminority employees. *Weber*, 443 U.S. at 208, 99 S.Ct. at 2729. Each of these concerns will be addressed separately.

### B. The Purpose of the Plan

■ *Weber*'s discussion of what it found to be the permissible purposes for the affirmative action plan there at issue was brief: "The purposes of the plan mirror those of the statute. Both were designed to break down old patterns of racial segregation and hierarchy. Both were structured to 'open employment opportunities for Negroes in occupations which have been traditionally closed to them'". *Weber*, 443 U.S. at 208, 99 S.Ct. at 2730 (quoting 110 Cong.Rec. 6548 (1964) (remarks of Sen. Humphrey)). What the *Weber* Court found sufficient was followed and expounded upon in *Johnson*. In both *Weber* and *Johnson*, the Court approved the affirmative action plans at issue based on their express and substantiated purpose of remedying an underrepresentation of women or minorities.

In the wake of *Weber* and *Johnson*, lower court opinions considering voluntary, race-conscious affirmative action plans challenged under Title VII have construed the purpose prong of the inquiry strictly within the parameters set by the Supreme Court. Thus, the Tenth Circuit held that "[t]he purpose of race-conscious affirmative action must be to remedy the effects of past discrimination against a disadvantaged group that itself has been the victim of discrimination". *Cunico v. Pueblo School District No. 60*, 917 F.2d 431, 437 (10th Cir.1990) (footnote omitted).[6] The school district in *Cunico* defended its decision to retain a less senior black social worker instead of a more senior white social worker by claiming that it had a compelling interest in retaining the former because he was the district's only black administrator. The *Cunico* court opined that the school district's interest in retaining at least one black administrator is an availing Title VII defense only to the extent that it is "a necessary measure to remedy past discrimination". *Id.* at 439. The court went on to consider whether there was direct evidence of past or present discrimination or a statistical imbalance which could support an inference of discrimination. Finding neither of these, the court concluded that the purpose prong of *Weber* and *Johnson* had not been satisfied and that, therefore, the plan was invalid. *Id.*

The Ninth Circuit also construed the purpose prong of *Weber* and *Johnson* to require that an affirmative action plan be responsive to a manifest imbalance in the work force. *Higgins*, 823 F.2d at 356. The *Higgins* court concluded that racial imbalance in the city's work force generally, as well as in the specific department whose action was challenged, the fire department, combined with evidence that the affirmative action plan at issue was adopted to remedy these imbalances was sufficient to constitute a permissible purpose for the plan. *Id.*

6. In a footnote, the *Cunico* court stated that the only exception to this purpose recognized by a majority of the Supreme Court was expressed in *Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), in which the Court held that "benign, race-conscious measures mandated by Congress" are constitutionally permissible even though not remedial as long as they are substantially related to important governmental objectives. *Cunico*, 917 F.2d at 437 n. 4 (citing *Metro Broadcasting*, 497 U.S. at 564–65, 110 S.Ct. at 3008–09). *Metro Broadcasting* and its relation to this case are discussed *infra*.

The only court in this circuit to consider this question similarly found a manifest imbalance to be a *sine qua non* for a lawful affirmative action plan. In finding that the affirmative action plan under scrutiny was not adopted to remedy past discrimination, the court held that "the plaintiff has succeeded in showing that the reason for the promotion of [the minority employee] over the [white] plaintiff, the execution of an affirmative action plan, was merely a pretext because the manifest imbalance required to be present before the use of an affirmative action plan is permissible did not exist". *Jaworski v. Cheney*, 771 F.Supp. 109, 113 (E.D.Pa.1991).

As the stipulated facts in this case make abundantly clear, the Board does not even attempt to show that its affirmative action plan was adopted to remedy past discrimination or as the result of a manifest imbalance in the employment of minorities because it concedes that it would be unable to make such a showing. Its concessions that it knows of no prior discrimination by it or charges of discrimination against it in the hiring of teachers and that there has been and is no minority underrepresentation or underutilization, as well as the statistical analyses which demonstrate that the percentage of minority teachers employed by the Board has consistently exceeded the percentage of qualified minorities in the work force, foreclose any argument that the plan was adopted for any sort of remedial purpose as contemplated by *Weber, Johnson,* and the lower court authority following those decisions.

Recognizing this, the Board seeks to justify its affirmative action plan not by reference to a remedial purpose, but by asserting that the plan was adopted for the nonremedial purpose of promoting racial diversity "for education's sake" or "as an educational goal" in a department, but not in the Board's teacher work force, with an otherwise all white faculty. Conceding that there is no authority approving of such a purpose to support an affirmative action plan under Title VII, the Board would have the court infer the propriety of this purpose from fragments of other authority. A close look at the case

law and the purpose of Title VII, however, reveals that laudable as this purpose may be, it cannot support a race-conscious affirmative action plan.

The Board argues that the role of education in society and the especial care with which courts have treated issues pertaining to education and schools distinguish this case—and, more particularly, the Board's asserted purpose for the affirmative action plan—from the substantial body of authority under which its plan would be invalid. To be sure, the quality of education is a paramount public concern and on numerous occasions the Supreme Court has commented on the crucial and sensitive nature of public schools in our society. *See Wygant,* 476 U.S. at 315 n. 8, 106 S.Ct. at 1868 n. 8 (Stevens, J., dissenting); *Board of Education v. Pico,* 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982); *Ambach v. Norwick,* 441 U.S. 68, 76, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979); *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 30, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973); *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Equally clear, of course, classifications based on race are generally pernicious and "may in fact promote notions of racial inferiority and lead to a politics of racial hostility". *Croson,* 488 U.S. at 493, 109 S.Ct. at 721 (Opinion of O'Connor, J.); *Bakke,* 438 U.S. at 298, 98 S.Ct. at 2752 (Opinion of Powell, J.); *see also Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) ("distinctions between citizens solely because of their ancestry' ... are 'odious to a free people whose institutions are founded upon the doctrine of equality' ".) (quoting *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943)). The task at hand is one of line drawing: can the asserted purpose justify a race-based classification under any circumstances and, if so, do the circumstances presented warrant such a classification?

It should initially be noted that the court is well aware of the distinction between the Equal Protection Clause of the Fourteenth Amendment and Title VII in this arena. It is clear after *Croson* that a majority of the

Supreme Court endorses the use of strict scrutiny in reviewing affirmative action plans challenged, unlike the plan here, under the Fourteenth Amendment. *See Croson,* 488 U.S. at 493, 109 S.Ct. at 721 (Opinion of O'Connor, J., joined by Rehnquist, C.J., and White and Kennedy, JJ.) and at 520, 109 S.Ct. at 735 (Scalia, J., Concurring in the Judgment). Title VII evokes an entirely different mode of analysis. As previously noted, cases considering affirmative action plans under Title VII have not strayed from the "manifest racial imbalance" language of *Weber* and *Johnson.* While the heretofore strict adherence in Title VII cases to approving only plans with remedial purposes is certainly a basis upon which to declare the Board's plan invalid, the Board's argument that diversity for education's sake should also justify an affirmative action plan challenged under Title VII merits some discussion. The absence of Title VII case law in this regard, however, and the making of new law which adoption of the Board's asserted purpose would engender, requires that the assessment of permissible and impermissible purposes for affirmative action consider the more varied analyses undertaken under the Fourteenth Amendment. Parenthetically, the court stresses that the citation of these authorities is not an implicit endorsement of either strict scrutiny or an expansion of the law; rather, the consideration of how certain purposes have been received provides a useful—and, indeed, the only—judicial benchmark by which to judge the Board's asserted purpose.

■ Remedying specific acts of past discrimination is an interest sufficient to permit race-based affirmative action. In the Fourteenth Amendment context, it appears that this interest is considered a "compelling government interest". *See Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848 (plurality opinion); *id.* at 286, 106 S.Ct. at 1853 (O'Connor, J.) ("The Court is in agreement that, whatever the formulation employed, remedying past discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program".). Moreover, it is beyond question that remedying specific past discrimination is a sufficient justification under Title VII for an affirmative action plan.

*Johnson,* 480 U.S. at 616, 107 S.Ct. at 1442; *Weber,* 443 U.S. at 208, 99 S.Ct. at 2729. Equally clear, of course, is that this justification is not asserted here.

On the other hand, the Supreme Court has repeatedly determined that in the Fourteenth Amendment context general societal discrimination is a purpose which is "too amorphous a basis for imposing a racially classified remedy". *Wygant,* 476 U.S. at 276, 106 S.Ct. at 1848 (plurality). *See Croson,* 488 U.S. at 505, 109 S.Ct. at 728 ("In sum, none of the evidence presented by the city points to any identified discrimination in the Richmond construction industry. We, therefore, hold that the city has failed to demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race"); *Wygant,* 476 U.S. at 276, 106 S.Ct. at 1848; *id.,* 476 U.S. at 288, 106 S.Ct. at 1854 (O'Connor, J.) ("a government agency's interest in remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass muster under strict scrutiny"); *Bakke,* 438 U.S. at 265, 98 S.Ct. at 2733 (Opinion of Powell, J.) (the goal of desegregation, i.e. to redress specific instances of racial discrimination, "was far more focused than the remedying of effects of 'societal discrimination', an amorphous concept of injury that may be ageless in its reach into the past"); *Hazelwood School District v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977). Under the Title VII case law, however, "manifest imbalance" requires only that an employer show statistical imbalances not necessarily attributable to its own conduct. *See Johnson,* 480 U.S. at 631–32, 107 S.Ct. at 1451 (in determining if there is a "manifest imbalance", the appropriate mode of analysis is a statistical comparison of the percentage of minorities in the employer's work force with the percentage of minorities in either the general labor population or the specially qualified labor population, depending on the nature of the job); *Cunico,* 917 F.2d at 439 (comparing percentage of minority teachers employed by the defendant school district in the past for purposes of whether an affirmative action plan was justified).

Another purported justification for affirmative action plans which has been considered and rejected by the Supreme Court in the Fourteenth Amendment context is the "role model" theory. The defendant board of education in *Wygant* attempted to justify its adoption of an affirmative action plan by asserting that it had a need for more minority faculty role models for its minority students. *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847. In addition to reaffirming that general societal discrimination, without more, cannot justify race-based remedial measures under the Fourteenth Amendment, the Court debunked the role model theory on several other grounds. First, it noted that this justification had no logical stopping point. "The role model theory allows the Board to engage in discriminatory hiring and layoff practices long past the point required by any legitimate *remedial* purpose". *Id.* at 267, 106 S.Ct. at 1843 (emphasis added) (Opinion of Powell, J.). The *Wygant* plurality further found that because the role model theory attempts to tie the percentage of minority teachers to the percentage of minority students, it could be used to justify a small percentage of minority teachers by reference to a small percentage of minority students— a result wholly incompatible with the obligation of public employers to remedy past discriminatory practices. *Id.* at 276, 106 S.Ct. at 1848. Moreover, the plurality found that taken to its extreme, the role model theory could lead to the very segregation that was rejected in *Brown v. Board of Education.* *Id.*

The Board has attempted to go beyond where these and other cases have gone and weave together a variety of judicial statements to support its theory that affirmative action for the purpose of racial diversity within a high school faculty is permissible under Title VII. Chief among the sources to which the Board points is the statement of

Justice Powell in *Bakke* that the attainment of a diverse student body is a "constitutionally permissible goal for an institution of higher education". *Bakke*, 438 U.S. at 311–12, 98 S.Ct. at 2759 (Opinion of Powell, J.).

The second source on which the Board relies is Justice O'Connor's concurring opinion in *Wygant*.[7] Justice O'Connor agreed with the plurality's judgment that the role model theory is not a legitimate remedial purpose which can support an affirmative action plan. In the course of delineating what she termed "a fair measure of consensus" among the court's various members and opinions with respect to certain state interests asserted to justify affirmative action plans, Justice O'Connor stated that

although its precise contours are uncertain, a state interest in the promotion of racial diversity has been found sufficiently 'compelling', at least in the context of higher education, to support the use of racial considerations in furthering that interest ... And certainly nothing the Court has said today necessarily forecloses the possibility that the Court will find other governmental interests which have been relied upon in the lower courts but which have not been passed on here to be sufficiently 'important' or 'compelling' to sustain the use of affirmative action policies.

*Wygant*, 476 U.S. at 286, 106 S.Ct. at 1853 (citations omitted). In addition, she noted that the role model theory "should not be confused with the very different goal of promoting racial diversity among the faculty". *Id.* at 288 n. *, 106 S.Ct. at 1854 n. *.

More recently, the Court has held that benign race conscious measures mandated by Congress could be supported by the "important governmental objective" of enhancing broadcast programming diversity. *Metro Broadcasting*, 497 U.S. at 567, 110 S.Ct. at 3010. In approving such diversity as an

7. Because there was no single opinion in which five justices joined in *Wygant*, Justice O'Connor's concurrence in portions of Justice Powell's opinion on narrower grounds must be read as the Opinion of the Court. *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....'") (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (Opinion of Stewart, J.). *See also Krupa v. New Castle County*, 732 F.Supp. 497, 508 n. 36 (D.Del.1990) (construing *Wygant* consistently with *Marks*).

"important governmental objective", the Court reaffirmed Justice Powell's statement in *Bakke* that a diverse student body is a constitutionally permissible goal on which a race-conscious admissions program can be based. *Id.* at 568, 110 S.Ct. at 3010. Key to the Court's consideration of the race-conscious measures at issue in *Metro Broadcasting* was the fact that the measures were mandated by Congress and, therefore, viewed with the deference appropriately accorded Congress as a co-equal branch of the federal government charged with legislating to enforce the equal protection guarantees of the Fourteenth Amendment. *Id.* at 563, 110 S.Ct. at 3008 (citing *Fullilove v. Klutznick*, 448 U.S. 448, 472, 100 S.Ct. 2758, 2771, 65 L.Ed.2d 902 (1980)). Based on the institutional deference due Congress, the Court applied the "important governmental objectives/substantial relation" test rather than traditional strict scrutiny. *Id.*, 497 U.S. at 564–65, 110 S.Ct. at 3008.

The Court in *Metro Broadcasting* also cited Justice O'Connor's statement in *Wygant*, construing *Bakke*, that racial diversity in the context of higher education has been held to be a compelling government interest and that the Court's analysis should not be viewed as foreclosing other government interests which may also be sufficiently compelling to warrant race-conscious measures under the Fourteenth Amendment. *Id.* at 568 n. 15, 110 S.Ct. at 3010 n. 15. (citing *Wygant*, 476 U.S. at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring in part and concurring in judgment)). By contrast, Justice O'Connor's dissent in *Metro Broadcasting*, in which she urged that strict scrutiny be applied to the plan at issue instead of the "important governmental interest/substantial relation" test employed by the majority, asserts that the interest in increasing the diversity of broadcast viewpoints "is clearly not a compelling interest. It is simply too amorphous, too insubstantial, and too unrelated to any legitimate basis for employing racial classifications". *Id.*, 497 U.S. at 612, 110 S.Ct. at 3034 (O'Connor, J., dissenting). She further chided the five-justice majority for "too casually" extending the justifications which might support affirmative action beyond that of remedying past discrimination. *Id.* at 613, 110 S.Ct. at 3034.[8]

While the case law suggests that the Supreme Court considers faculty diversity to be at least a laudable goal, the Board's position must be rejected. It is sheer speculation as to whether the Court may one day extend its reading of Title VII to encompass a race conscious affirmative action plan in the absence of a manifest imbalance in the work force because of a desire to achieve faculty diversity. The Board has cited no authority that has been willing to stray so far from the holdings of *Weber* and *Johnson*, and this court will decline the invitation to do so. Based on the conclusion that the purpose asserted for the Board's affirmative action plan, i.e. faculty diversity "for education's sake", is not a permissible purpose under controlling Title VII case law, the court holds that the Board's plan is unlawful.[9]

---

8. The Board cites a number of circuit and district court opinions in support of its "faculty diversity" argument. The court finds these cases unpersuasive. Many of the cases arose in the context of desegregation and faculty reassignment—a situation factually and legally distinguishable from the one *sub judice*. *See, e.g., Kromnick v. School District of Philadelphia*, 739 F.2d 894, 911 (3d Cir.1984) (approving under Title VII a race-conscious teacher integration plan designed to further the education of students in a *de facto* segregated public school system based on a finding that the plan was remedial in nature); *Vaughns v. Board of Education of Prince Georges County*, 742 F.Supp. 1275, 1306–08 (D.Md.1990) (teacher reassignment in the context of desegregation).

9. Aside from the legal viability of the Board's asserted "educational diversity" justification for its plan, plaintiff and Taxman also contend that this purported justification should be rejected as without factual foundation. They claim that even if "educational diversity" were a permissible purpose for the affirmative action plan at issue, there is no evidence that the Board, in fact, acted for that purpose. The Board takes issue with this assessment of the record, citing the deposition testimony of Board President Theodore Kruse and Board Vice President Paula Van Riper and belatedly, plaintiff and Taxman claim, submitting a certification of Kruse to "explain" the deposition testimony and purporting to set forth the prior position of other Board members. Whether the Kruse certification or counsel's accompanying Rule 56(f) certification related to this issue were improperly submitted, whether the Kruse certification contains rank hearsay, and whether the deposition testimony cited would create a genuine issue of material fact as

## C. *The Plan's Effect on Nonminorities*

■ Even were the court to find that the Board adopted the plan for a purpose that is permissible under Title VII, the plan would be struck down under the second prong of *Weber* and *Johnson*. After finding the purpose of the plan at issue to be acceptable, the Court in *Weber* found that the plan did not "unnecessarily trammel the interests of the white employees". *Weber*, 443 U.S. at 208, 99 S.Ct. at 2729. In this regard, the Court noted that the plan (1) did not require the discharge of white workers to be replaced by black workers; (2) did not create an absolute bar to the advancement of white employees; and (3) was a temporary measure not intended to maintain a racial balance but, rather, to eliminate a manifest imbalance. *Id.* Based on these criteria, the Court concluded that the voluntarily adopted race-conscious measures were permissible under Title VII. *Johnson* reaffirmed this analysis in the course of determining whether an affirmative action plan infringed too greatly on the rights of those who did not benefit by it. *Johnson*, 480 U.S. at 637–40, 107 S.Ct. at 1454–56 (finding that the rights of those not benefitted were not unnecessarily trammeled because (1) no person was excluded from consideration for the promotion based on nonminority status; (2) petitioner had no absolute entitlement to the promotion and retained his job; and (3) the plan was temporary because it was intended to *attain*, rather than *maintain*, a balanced work force).

Considering these factors with reference to the plan at issue here, it is apparent that that plan simply cannot pass muster under the second prong of *Weber* and *Johnson*. The Board's plan certainly does not require that nonminorities be fired and minority teachers be hired in their place. Nor can it be said that the plan requires blind hiring or imposes a quota system on the hiring of teachers by the Board. In this respect, the plan avoids two of the potential pitfalls cited in *Weber* and *Johnson*.

The plan at issue, however, does not compare so favorably with respect to the other two factors relevant to whether an affirmative action plan unnecessarily trammels the rights of nonminorities. First, in contrast to *Johnson*, where the plan pertained to promotions, the Board's minority preference applies to layoff decisions. While there may be no firmly rooted expectation in obtaining a promotion, *see Johnson*, 480 U.S. at 638, 107 S.Ct. at 1455, there is clearly a legitimate and firmly rooted expectation in continued employment. There is no contention that the Board determined to eliminate a teaching spot in the Business Education Department of Piscataway High School because of Taxman's (or anyone else's) race.[10] However, as a matter of common sense and of case law, the burden imposed on those not favored under the plan, here Taxman, is significantly greater and more concentrated where the employment decision reached as a result of the plan is a layoff rather than a promotion or an initial hiring decision. *See id.* (although petitioner was denied a promotion, he retained his employment with the agency); *Wygant*, 476 U.S. at 282, 106 S.Ct. at 1851 ("In cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose") (plurality) (emphasis in original); *Vaughns*, 742 F.Supp. at 1307 (finding that the plan did not "unnecessarily tram-

to whether the Board intended to act for the purpose of educational diversity need not be decided in light of the court's conclusion that the purpose asserted, even if factually supported, does not constitute a legal justification for the Board's affirmative action plan and that, in any event, the plan unnecessarily trammels the rights of nonminority teachers.

**10.** There is no question that the Board was well within its rights in deciding to eliminate a teaching position in the Business Education Department. In a sense, then, Taxman, as the teacher who, along with Williams, was tied for the lowest seniority in the department had only a legitimate entitlement to have the layoff decision made randomly rather than on the basis of race. Viewed in this light, the burden on Taxman was less than if the plan contemplated layoff decisions made on membership in a minority group without consideration of seniority or qualifications. *Cf. Cunico*, 917 F.2d at 440. Nevertheless, this fact does not vitiate the extent or seriousness of the burden associated with the loss of a job as compared to the failure to be hired or promoted.

mel" the interests of nonminority teachers where the teachers were not discharged, but only transferred).

Even more damaging to the Board's plan is the fact that there is no indication that it is temporary. The Court in *Weber* emphasized that the plan at issue was not overly intrusive to nonminorities because it was, by its very nature, temporary. The preferential selection of craft trainees in *Weber* was to cease as soon as the percentage of trainees approximated the percentage of blacks in the local labor force. *Weber,* 443 U.S. at 208–09, 99 S.Ct. at 2730. The preference thus had a discrete and discernable end. In *Johnson,* the Court recognized that the plan at issue there had no such discernable ending because it did not specify any percentage comparison to be reached. Nonetheless, the Court was sufficiently comforted by the fact that the plan was intended to *attain,* not maintain, a balanced work force and by the fact that "substantial evidence show[ed] that the Agency ha[d] sought to take a moderate, gradual approach to eliminating the imbalance in its work force". *Johnson,* 480 U.S. at 640, 107 S.Ct. at 1456. Based on this, the Court found "ample assurance that the Agency does not seek to use its Plan to maintain a permanent racial and sexual balance". *Id. See Kromnick,* 739 F.2d at 911–12 (finding that a faculty reassignment plan was not shown to be permanent where it was part of the school district's collective bargaining agreement and therefore subject to biennial renegotiation and the plan was under the continued monitoring of the state court as the result of a consent order entered in state court); *Vaughns,* 742 F.Supp. at 1308 (relying on *Kromnick* ).

Significantly, the Board does not even suggest that its plan is temporary and there is no indication that the plan is to be reassessed with any regularity or, for that matter, at all. The program embodying the racial preference at issue was first adopted in 1975, became policy in 1983, and, of course, remains—until now—in effect. While a long duration does not necessarily indicate permanence, the Board's failure to contest the assertion that the plan is not temporary is telling. Indeed, rather than arguing that the plan is temporary, the Board contends that because it was not adopted for a remedial purpose, whether it is temporary or permanent is irrelevant in assessing whether the plan unnecessarily trammels the rights of nonminorities.

This contention finds no support in the case law. Moreover, it defies common sense that an affirmative action plan adopted for, *arguendo,* the permissible purpose of increasing diversity among a public school's faculty could be permitted to exist without end. If the goal of the plan is to enrich the educational experience of students by employing a more diverse faculty, this goal will be achieved at some point. What that point will be, however, is wholly unclear for the "diversity" which is sought is nowhere defined. Is a diverse faculty one which is 10% minority, 20% minority, or 50% minority? In this connection, there is no finding by the Board or any other authority that the faculty as it now exists is not already "diverse".

Even if "diversity" were defined, the plan does not indicate that it will end when diversity is achieved. Theoretically at least, the preference for minority teachers in situations in which two candidates for a layoff are tied in seniority as well as qualifications could continue until the percentage of minority teachers far exceeds the number of nonminority teachers—in essence, backpedalling from diversity. While, of course, this is not likely to occur, the possibility that it may evidences the potentially significant burden on nonminorities of such a limitless plan, harkening back to the Supreme Court's rejection in *Wygant* of measures which are "timeless in their ability to affect the future". *Wygant,* 476 U.S. at 276, 106 S.Ct. at 1848.

*Metro Broadcasting,* in which the Supreme Court upheld a minority preference plan implemented for the purpose of achieving broadcasting diversity, does not support the Board's argument. First, the Court paid deference to the legislative function of Congress as a co-equal branch of government and noted that "the Commission adopted and Congress endorsed minority ownership preferences only after long study and painstaking consideration of all available alternatives". *Metro Broadcasting,* 497 U.S. at 584, 110

S.Ct. at 3019. Conspicuously absent here is evidence that the Board has tried or considered alternative and less burdensome means to achieve diversity in its faculty. Even more damning to the Board's argument, however, is the fact that the Court in *Metro Broadcasting* relied on the limited duration of the congressionally approved race preference plan in finding it permissible.

> Although it has underscored emphatically its support for the minority ownership policies, Congress has manifested that support through a series of appropriations acts of finite duration, thereby ensuring future reevaluations of the need for the minority ownership program as the number of minority broadcasters increases.

*Id.* at 594, 110 S.Ct. at 3024. *See Fullilove,* 448 U.S. at 489, 100 S.Ct. at 2780 (approving a plan which is "appropriately limited in extent and duration, and subject to reassessment and reevaluation by the Congress prior to any extension or re-enactment") (Opinion of Burger, C.J.) (footnote omitted). Thus, the Court recognized that a plan which seeks to foster diversity by means of a minority preference must have an end.

> Congress and the Commission have adopted a policy of minority ownership not as an end in itself, but rather as a means of achieving greater programming diversity. Such a goal carries its own natural limit, for there will be no need for further minority preferences once sufficient diversity has been achieved.

*Metro Broadcasting,* 497 U.S. at 596, 110 S.Ct. at 3025.

The Board's plan has none of the limitations that has been deemed necessary in all other instances in which race-conscious plans have been upheld and there is no suggestion to the contrary. An affirmative action plan which grants a preference based on race cannot be boundless, even under the farthest reaches of the law as it is today. Therefore, even if faculty diversity were a purpose on which a race-conscious plan could be based, the plan presented here would be struck down as overly intrusive to the rights of nonminorities.

## IV. CONCLUSION

The court concludes that the affirmative action plan adopted by the Board and pursuant to which Taxman was laid off was adopted for an impermissible purpose. The court further concludes that even were the asserted purpose legally sufficient to justify the Board's plan, the plan would be unlawful because it "unnecessarily trammels" the rights of nonminorities. Finding that no genuine issue of fact for trial on liability remains and that the Board's affirmative action plan is unlawful under Title VII and the NJLAD, partial summary judgment as to liability in favor of the United States and Taxman will be granted. Concomitantly, the Board's motion for summary judgment will be denied.

An appropriate order shall issue.

### ORDER

This matter having come before the court upon the motion of defendant for summary judgment, pursuant to Fed.R.Civ.P. 56(c); and upon cross-motions of plaintiff and intervenor for partial summary judgment as to liability; and the court having considered the submissions of the parties both in support of and in opposition to the motions without oral argument, pursuant to Fed.R.Civ.P. 78; and the court also having considered *sua sponte* the effect of the opinion of the Supreme Court of New Jersey in *Montells v. Haynes,* 133 N.J. 282, 627 A.2d 654 (1993) on the court's previous ruling dismissing certain portions of intervenor's NJLAD claims;

IT IS on this 9th day of September, 1993 hereby

ORDERED that defendant's motion for summary judgment is denied; and it is further

ORDERED that the motions of plaintiff and intervenor for partial summary judgment as to liability are granted; and it is further

ORDERED that those portions of intervenor's NJLAD claims previously dismissed by the court are reinstated.